Dickson, J.
On the 19th day of April, 1875, a contract was entered into between Joseph E. Swan and Eobert Clarke & Company, canceling an older contract of date of December 31, 1870, about “Swan’s Treatise,” a work designed for use by justices of the peace, attorneys and constables, a-work of great worth and of many editions, and now in general use in Ohio. The author, Judge Swan, either had not the means or the opportunity, or did not desire to stereotype, publish and sell this work, hence the contract with Eobert Clarke & Company, publishers.
The questions at issue are two: To whom now belong the stereotypes, and to whom now belong the exclusive rights of publication and sale?
*637 The parts of the contract of April 19th, 1875, calling for in-' terpretatioñ are:
“The stereotypes when made shall belong to said Swan and the exclusive use of the same is hereby granted to said Robert Clarke & Company.”
The expenses incident to making the stereotypes were to be advanced by the Robert Clarke Company, who were in turn to be reimbursed out of the sales before any payments were made to Swan.
Again quoting the contract:
“If Clarke & Company or their successors fail to make payment for any of the said editions or any of the installments thereof for sixty days after such payment becomes due, this contract by written notice from said Swan to said Clarke •& Company or successors, shall, as respects any right to use said plates or publish said work, thereafter cease and terminate.”
Then follow provisions in case of destruction of plates by fire.
On the 27th day of February, 1880, a new contract between the same parties was made, embodying the same terms except as to division of profits, and specifically reaffirming all other agreements in the former contract.
On April 29, 1903, a new contract was made between Frank Swan and James A. Swan, trustees of the estate of Joseph R. Swan, deceased, and the Robert Clarke Company, a corporation of Cincinnati, Hamilton county, Ohio. Various recitals appear in the contract, among others:
■ “Whereas a fire has occurred in the publishing house of the party of the second part, by which fire the stereotype plates of said ‘Swan’s Treatise’ were destroyed, and it has become necessary to renew said plates and to print and publish a new edition of said treatise, and
“Whereas, the parties hereby desire to enter into an.agreement by which the said stereotype plates shall be renewed and said Swan’s Treatise be-printed, published and sold,
“Now, therefore, the parties hereby for and in consideration of the agreements of each, hereinafter contained, do agree and contract as follows:
“1st. The party of the second part (the Robert Clarke Company) hereby agrees to prepare a new set of stereotype *638 plates for the printing of ‘Swan’s Treatise’ and to pay the expenses of preparing the said plates.
“2d. The parties of the first part hereby agree to reimburse the party of the second part for one-half of the expenses of preparing said plates,” * * * the same to be out of the proceeds of sale.
Then follows an agreement that:
“The'Robert Clarke Company shall have the exclusive use of said stereotype plates and to print and publish * ' * * in accordance with the provisions, terms and conditions of a certain agreement in writing made by and between Joseph R. Swan, as first party, and Robert Clarke & Company as second party, April 19, 1875, as modified July 27, 1880.”
Also the trustees of Judge Swan agree that:
“The Robert Clarke Company shall have the exclusive use of the plates and to print and to sell, all in accordance with the contract of February 27, 1880.”
Then follow recitals that all the provisions of the contracts of April 19, 1875, and February 27, 1880, “shall in every respect govern the printing, publishing and sale of said ‘Swan’s Treatise,’ except in so far as the same are modified by these agreements.”
By proceedings had in this court the Robert Clarke Company was placed in the hands of a receiver. In due course all _ the assets, including the good will, and the name, the Robert Clarke Company, have been sold. At each step in these proceedings had, “Swan’s Treatise” was excepted, and by agreement any decision as to the rights therein was continued, and now this court has for determination, who owns the stereotypes and who owns the exclusive right of publication and sale.
' The meaning of every contract is determined by the provisions of’the whole contract and by ,a consideration of the subject-matter. It is clear that Judge Swan either did not have the money or would not furnish it to prepare the stereotypes; hence the first contract of 1875. The money was to be furnished by Clarke & Company and Clarke & Company was to be reimbursed, but the ownership was to be in Swan. This ownership of the stereotypes in Swan continued in the contract of 1880. *639 In 1903, the stereotypes were destroyed by fire. Then it was to the mutual advantage of the Swans and the Robert- Clarke Company that the stereotypes be made anew. By the new contract which was made, all the money to renew the stereotypes was to be advanced by the Robert Clarke Company. This contract is silent as to any reimbursement to the Robert Clarke Company, but this contract in words clear, reiterates all the provisions of the former contracts, among which are the words, “the stereotypes when made shall belong to said Swan.”
Ownership of the stereotypes is—was considered—important, and any change therein if intended, should have been expressed. A court can not do -what the parties themselves fail to do. At best there can be only a claim to a lien for the money advanced; but a lien is properly a security for a debt, and a debt presupposes a contract—an .agreement to pay. This contract is silent as to any reimbursement. There is no debt, no security, and there can be no lien.
Every contract between persons contemplates death and a personal representative. Hence the court find the exclusive ownership of the stereotypes in Frank Swan, and James A, Swan, trustees of the estate of Joseph R. Swan, deceased.
Who owns the exclusive rights of publication and sale? The subject-matter is “Swan’s Treatise,” a legal work. An author usually has not the means, including money and opportunity, to place his work on the market. His ownership in the off-spring of his brain is a peculiarly personal ownership. This personal ownership or privilege in the author the law will protect. This rule will not be violated unless the author himself has parted with his work by clear, definite terms. This rule is as it were a common law copyright.
In the contract we find the words:
“If- Clarke & Company or their successors fail to make payment for .any of the said editions or any of the installments thereof for sixty days after such payments become due, this contract by written notice from said Swan to said Clarke & Company or successors, shall, as respects any right to use said plates or publish said work, thereafter cease and terminate.”
*640 Again the contract is renewed with the Robert Clarke Company. Again some agreement as to publishing “Swan’s Treatise” was made by Swim’s trustees with the receiver, an officer of this court. Judge Swan contemplated a successor to Robert Clarke & Company—such was in the contract—recognized and dealt with Robert Clarke Company—dealt with the Robert Clarke Company. The trustees of Swan recognized a successor to the Robert Clarke Company, the receiver—dealt with him as a successor. Does the contract by the use of the word successor—do the acts of the elder Swan—the acts of his trustees, indicate an intention to part with the right to control the publication of the work? The intention to change from Robert Clarke & Company to Robert Clarke Company and to the Robert Clarke Company, are clear, definite and certain. Each change was to a successor. Whatever went to each of these successors went -by consent expressly. Yet the word successor in the contract accompanies terms of forfeiture only. Each successor so far acquired rights and the consents of the Swans, and each successor acquired the burden—the penalty of a forfeiture in the event of a default. So far, each successor obtained all his rights by the consent of the author. There can be no implication by these acts that the author would thus always act. There can be no implication from the contracts or from the acts of Judge Swan and his trustees that they would consent to a public sale of his or their rights. The mere fact that Swan’s trustees have had dealings with the receiver does not change any status; such dealings were temporary.
The receiver of this court now asks permission to sell to the highest bidder the right to publish and sell this work.
The court is of the opinion that this permission must be denied. To hold otherwise would tend to defeat the protection the law has thrown around authors, a protection which obtains by the dictates of humanity and of the public good. Such a sale by this court might make it possible for the publisher of an inferior rival work to place this work in obscurity, a result neither contemplated by the author, nor good for the public.
The stereotypes and the right to publish and to sell “Swan’s Treatise” belongs exclusively to Swan’s estate.